**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **OMNI ENERGY GROUP, LLC** | : | |
| A New Jersey Limited Liability Company | : | |
| 67910 Pickering Road | : | |
| St. Clairsville, Ohio 43950 | : | |
| | : | CASE NO._____ |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE_____ |
| | : | |
| **OHIO DEPARTMENT OF NATURAL** | : | |
| **RESOURCES,** | : | |
| **c/o The Hon. Mary Mertz, Director** | : | |
| 2045 Morse Road | : | **TYPE:  CIVIL ACTION - OTHER** |
| Columbus, Ohio 43229-6693 | : | |
| | : | **- 28 U.S.C. 2201** |
| and | : | **- 42 U.S.C. 1983** |
| | : | |
| **ERIC M. VENDEL, Chief,** | : | |
| Ohio Dept. Natural Resources, Division of | : | |
| Oil and Gas Resources Management | : | |
| 2045 Morse Road, Building F-2 | : | |
| Columbus, Ohio 43229-6693 | : | |
| **In both his Individual and Official** | : | |
| **Capacities** | : | |
| | : | |
| and | : | |
| | : | |
| **ANDREW ADGATE,** | : | |
| **Natural Resources Director 4** | : | |
| Ohio Dept. Natural Resources, Division of | : | |
| Oil and Gas Resources Management | : | |
| 2045 Morse Road, Building F-2 | : | |
| Columbus, Ohio 43229-6693 | : | |
| **In both his Individual and Official** | : | |
| **Capacities** | : | |
| | : | |
| and | : | |

**MICHAEL K. BROWN,** :
**Underground Injection Control** :
**Manager** :
Ohio Dept. Natural Resources, Division of :
Oil and Gas Resources Management :
2045 Morse Road, Building F-2 :
Columbus, Ohio 43229-6693 :
**In both his Individual and Official** :
**Capacities** :
:
and :
:
**HOLLY LOVEY, ESQ.** :
**Staff Attorney** :
Ohio Dept. Natural Resources, Division of :
Oil and Gas Resources Management :
2045 Morse Road, Building F-2 :
Columbus, Ohio 43229-6693 :
**In both her Individual and Official** :
**Capacities** :
:
and :
:
**SEAN S. MURPHY, P.E.** :
14016 Smithurst Road :
Edmond, Oklahoma 73013 :
**In both his Individual and Official** :
**Capacities** :
:
and :
:
**UNITED STATES** :
**ENVIRONMENTAL PROTECTION** :
**AGENCY** :
**c/o The Hon. Michael Reagan,** :
**Administrator** :
William Jefferson Clinton Building :
1200 Pennsylvania Ave, N.W. :
Mail Code 1101A :
Washington, D.C. 20460 :
:
and :

| | |
|---|---|
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY – REGION V c/o The Hon. Debra Shore, Regional Administrator** 77 W. Jackson Boulevard Chicago, IL 60604 | : : : : : : : : : |
| and | : : |
| **JOHN DOE #1** An unidentified Co-Conspirator | : : : |
| and | : : |
| **JOHN DOE #2** An unidentified Co-Conspirator | : : : |
| Defendants. | : : |

# COMPLAINT

NOW COMES Plaintiff, Omni Energy Group, LLC, by and through counsel, which states for its Complaint as follows:

## PARTIES:

1.      Plaintiff, OMNI ENERGY GROUP, LLC ("Omni"), is a New Jersey Limited Liability Company registered to do business in the State of Ohio as a foreign limited liability company, entity number 4306166. At a cost in excess of $8 million, Omni constructed and formerly operated two (2) Class II Saltwater Injection wells, to-wit: GMR#1 and GMR#2, in Belmont County, Ohio, under two (2) permits to inject, to-wit: Chief's Order 2021-180 (GMR#2) and Chief's Order 2022-125 (GMR#1), issued by Defendant, Eric M. Vendel, Chief, Ohio Department of Natural Resources, Division of Oil and Gas Resources Management. Omni's principal place of business is located at 67910 Pickering Road, St. Clairsville, Ohio 43950.

2.      Defendant, OHIO DEPARTMENT OF NATURAL RESOURCES ("ODNR"), is an executive agency within the government of the State of Ohio.  It was statutorily established pursuant to R.C. 121.02(F).  ODNR operates the Division of Oil and Gas Resources Management ("Division") pursuant to Ohio Revised Code Chapter 1509. ODNR's duly appointed Director is Mary Mertz.  Relevant to this case, ODNR entered into a primacy agreement with Defendant, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, for enforcement of the Safe Drinking Water Act ("SDWA" as set forth in 42 U.S.C. 300f *et seq*.) in 1983.  Among other duties, the primacy agreement (as amended) grants the State of Ohio, through ODNR, the authority to regulate all Class II Saltwater Injection wells in Ohio. ODNR's principal business address is located at 2045 Morse Road, Columbus, Ohio 43229-6693.

3.      At all times relevant, and since March 16, 2020, Defendant, ERIC M. VENDEL, CHIEF, OHIO DEPARTMENT OF NATURAL RESOURCES, DIVISION OF OIL AND GAS RESOURCES MANAGEMENT ("Chief") served as the duly appointed Chief of the Division.  He is named in both his official and individual capacities.  The Chief holds the exclusive authority to regulate the permitting, location, and spacing of oil and gas wells and production operations within the State of Ohio, including but not limited to Class II Saltwater Injection well permitting and operation as conferred by R.C. Chapter 1509 and OAC 1501:9-03 (Saltwater Operation).  The Division's principal business address is located at 2045 Morse Road, Building F-2, Columbus, Ohio 43229-6693.

4.      At all times relevant, Defendant, ANDREW ADGATE, served as a Natural Resources Director 4 within the Division. Mr. Adgate is named in both his official and individual capacities.  At all times relevant, Mr. Adgate was the Chief's primary deputy,

such that the Chief delegated authority to Mr. Adgate to execute various Chief's Orders, including but not limited to the Omni-related Chief's Orders 2022-124 and 2022-125, which relate to GMR#1's permit to inject. Mr. Adgate's principal business address is located at 2045 Morse Road, Building F-2, Columbus, Ohio 43229-6693.

5. At all times relevant, Defendant, MICHAEL K. BROWN, served as the duly appointed Manager of the Underground Injection Control ("UIC") unit within the Division. Mr. Brown is named in both his official and individual capacities. Among other duties, at all times relevant, Mr. Brown was responsible for the direction and management of Omni's Class II Saltwater Injection well permitting, which included Omni's permits to initially drill, and thereafter, inject brine into its Class II Saltwater Injection wells. Mr. Brown's principal business address is located at 2045 Morse Road, Building F-2, Columbus, Ohio 43229-6693.

6. At all times relevant, Defendant, HOLLY LOVEY, ESQ., served as a duly appointed Staff Attorney and/or Division Counsel within the Division. Ms. Lovey is named in both her official and individual capacities. Among other duties, Ms. Lovey was responsible for ensuring the Chief and the Division conducted its regulatory activities in full compliance with the Ohio Revised Code, the Ohio Administrative Code, primacy enforcement agreements with the EPA, as well as the SDWA. Ms. Lovey's principal business address is located at 2045 Morse Road, Building F-2, Columbus, Ohio 43229-6693.

7. At all times relevant, and upon information and belief, Defendant, SEAN S. MURPHY, P.E., who is a resident of the State of Oklahoma, served as a duly licensed and appointed petroleum engineering consultant for the Division. Mr. Murphy is named in both his official, if any, and individual capacities. The Division engaged Mr.

Murphy to provide a technical analysis of Omni's step-rate testing relative to GMR#1 and GMR#2, which served as the basis for the Chief and Mr. Adgate issuing Chief's Orders 2022-124 and 2022-125. Mr. Murphy's principal business address is located at 14016 Smithurst Road, Edmond, Oklahoma 73013.

8. Defendant, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA"), is an executive agency of the federal government of the United States of America. Michael Reagan is the EPA's duly appointed, and United States Senate confirmed, Administrator. At all times relevant, EPA maintains the ultimate legal responsibility for the uniform enforcement of the SDWA among the several states, including but not limited to all states subject to a primacy enforcement agreement with the EPA relative to the SDWA, including the State of Ohio. EPA's principal headquarters is located at William Jefferson Clinton Building, 1200 Pennsylvania Ave, N.W., Mail Code 1101A, Washington, D.C. 20460.

9. Defendant, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY – REGION V ("REGION V"), is a regional division of the EPA with responsibility for the execution of the EPA's various programs, including but not limited to primacy enforcement agreements and the SDWA, within Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin and thirty-seven (37) Tribes therein. Debra Shore is the REGION V's duly appointed Regional Administrator. Among its other duties, at all times relevant, REGION V was responsible for the uniform enforcement of the SDWA among the several states within its region, as well as all duties agreed to within the current Memorandum of Agreement relative to the SDWA with the State of Ohio. REGION V's principal business location is 77 W. Jackson Boulevard, Chicago, IL 60604.

10.     The Plaintiff is currently unable to ascertain the true names or identities of Defendants JOHN DOE #1 and JOHN DOE #2.  Both are believed to be third-party individuals, not otherwise employed by any other named defendant, who are directly involved in the actions giving rise to this lawsuit. Despite reasonable investigation, Plaintiff is unable to determine the identity or identities of these individuals at this time.

## JURISDICTION:

11.     The SDWA contains a jurisdictional prerequisite at 42 U.S.C. § 300j-8(b). The statute requires a prospective plaintiff to provide sixty (60) days written notice of its intent to sue under the SDWA to multiple officials.  Sent via Certified U.S. Mail, return receipt requested, Plaintiff has fully complied with the SDWA's pre-requisite notice requirement, evidenced in Plaintiff's **Exhibit A,** as summarized below with the applicable service dates, to-wit:

   a.   EPA – Hon. Michael Reagan, Nov. 4, 2024;

   b.   U.S. Attorney General – Hon. Merrick B. Garland, Oct. 17, 2024;

   c.   REGION V – Hon. Debra Shore, Oct. 15, 2024;

   d.   ODNR – Hon. Mary Mertz, Oct. 21, 2024;

   e.   Ohio Attorney General – Hon. Dave Yost, Oct. 16, 2024; and

   f.   Division – Eric Vendel, Chief, Oct. 16, 2024.

12.     Thereafter, subject matter jurisdiction is conferred via:

   a.   42 U.S.C. § 300j-8(a) (SDWA Enforcement);

   b.   28 U.S.C. §1331 (Federal Question);

   c.   28 U.S.C. §1361 (Mandamus);

   d.   28 U.S.C. §2201 (Declaratory Judgment); and

   e.   42 U.S.C. §1983 (Civil Action for Deprivation of Rights).

**STATEMENT OF THE CASE:**

13.     The Chief's regulation of Omni's Class II Saltwater Injection Well is unlawful and in non-compliance with the SDWA.  With no Underground Source of Drinking Water ("USDW") in remote proximity to Omni's Class II Saltwater Injection Wells, this action seeks a declaration of Omni's right to a higher Maximum Allowable Injection Pressure(s) ("MAIP") per SDWA regulation.  As the Chief's unlawful regulation caused Omni to cease operation on or about July 1, 2022,  at great financial harm, this action seeks monetary damages for the denial of Omni's rights under the SDWA, and finally, this action seeks an order in Mandamus directing the EPA to do its duty to ensure the State of Ohio regulates and enforces the SDWA pursuant to the express terms of the statute, all corresponding regulations, and the existing Memorandum of Agreement between them.

**GENERAL FACTUAL ALLEGATIONS:**

14.     Omni re-states the allegations contained in paragraphs 1-13 as if fully re-written herein.

**A.  General SDWA Background:**

15.     Congress originally enacted the SDWA in 1974.  As expressed in the legislative history and statutory language, Congress intended the SDWA would ensure the safety and quality of the nation's public drinking water supplies.

16.     As expressed in 42 U.S.C. 300g-1, the primary objective of the SDWA is to protect public health by ensuring that all Americans have access to safe and clean drinking water. Congress recognized the risks posed by contaminants in drinking water, including natural and man-made pollutants.

17.     Within the SDWA, Congress directed the Administrator of the EPA to establish national primary drinking water standards to address contaminants that may pose a risk to health. These standards were to be scientifically based and enforceable.

18.     As part of the SDWA, Congress included provisions to regulate underground injection activities to prevent the contamination of *underground sources of drinking water*, recognizing the growing use of injection wells in various industries. (Emphasis added.)

### b. Primacy:

19.     While establishing federal oversight, Congress also intended to respect the roles of state and local governments. States were encouraged to apply for primary enforcement responsibility (a.k.a. "primacy") within their territory by implementing programs, including a state based UIC program, meeting SDWA's technical requirements for injection wells.

20.     Pursuant to 42 U.S.C. § 300h-1 of the SDWA, the State of Ohio applied for, and was granted, the right to regulate Class II wells (in addition to other well classes) via a "Primacy Agreement" executed between Ohio and the EPA on or about September 22, 1983.

21.     In addition to the terms and conditions within the SDWA, the Primacy Agreement is also subject to the regulatory guidelines within the "State UIC Program Requirements," set forth in 40 C.F.R. 145 *et seq.*, as well as the "Underground Injection Control Program: Criteria and Standards," as set forth in 40 C.F.R. 146 *et seq*.

22.     Important to this action, 40 CFR 146.23(a)(1) ("*Operating, monitoring, and reporting requirements*") provides explicit regulatory protection for USDWs, which are a primary focus of the SDWA throughout the United States:

Injection pressure at the wellhead shall not exceed a maximum which shall be calculated so as to assure that *the pressure during injection does not initiate new fractures or propagate existing fractures in the confining zone adjacent to the USDWs*. In no case shall injection pressure *cause the movement of injection or formation fluids into an underground source of drinking water*. (Emphasis added.)

23.     In conformity with its Primacy Agreement, Ohio maintains laws relative to Class II well construction and operation in R.C. Chapter 1509 *et seq.* (*Division of Oil and Gas Resources Management – Oil and Gas*), and the Division established rules relative to Class II well operation within Ohio Admin. Code 1501:9-03 (*Saltwater Operation*).

24.     Given the primacy grant from EPA, the Ohio General Assembly expressed Ohio's public policy relative to the interrelationship of the SDWA  and Ohio's regulatory framework.

25.     In R.C. 1509.22(D)(5), the Ohio General Assembly expressly stated:  "This division and rules, orders, and terms and conditions of permits adopted or issued under it shall be construed to be no more stringent than required for compliance with the Safe Drinking Water Act unless essential to ensure that underground sources of drinking water will not be endangered."

26.     In or about 1993, the ODNR, EPA and REGION V agreed to a Memorandum of Agreement ("MOA") amending Ohio's primacy agreement relative to Class II and III injection wells, specifically.  That MOA is attached hereto and incorporated as if fully re-written herein as **Plaintiff's Exhibit B**.

27.     Within the MOA, the EPA retained general oversight responsibility over ODNR's Class II Underground Injection Control ("UIC") program, stating:  "The US EPA shall oversee the ODNR' s administration of the UIC program on a continuing basis to assure that such administration is consistent with this MOA, the State UIC grant

application and program plan, and all applicable requirements embodied in current regulation, policies and Federal law."

### c. Omni's Permitting Process:

28.     Under Ohio law, a Class II well operator is required to obtain two (2) permits: First, a permit to drill a Class II well; and second, a permit to inject brine as defined in R.C. 1509.01(U).  However, Ohio's construction and operation standards must ultimately comply with the requirements of the SDWA and its corresponding regulations.

29.     On or about April 30, 2019, Omni submitted two (2) applications to the Division to construct two (2) Class II saltwater injection wells in Richland Township, Belmont County, Ohio. Those wells are known as "GMR#1" and "GMR#2," respectively.

30.     At all times relevant, the Chief holds the sole authority to issue both permits under Ohio law.

31.     In his first unlawful act, the Chief sought to impose a several month delay to present a staged "public meeting" during the COVID-19 pandemic.  However, the proposed "public meeting" was not otherwise authorized under Ohio law.

32.     In protest of the bogus "public meeting" proposal, Omni filed an original mandamus action against the Chief in the Supreme Court of Ohio and prevailed, in part, in *State ex rel. Omni Energy Group, L.L.C. v. Ohio Department of Natural Resources, Division of Oil and Gas Resources Management, et al.,* 164 Ohio St. 3d 470, 2020-Ohio-5581, 173 N.E.3d 1148.

33.     Specifically, the Supreme Court of Ohio ordered the Chief to render a decision on Omni's application for the permits to drill without the unlawful "public

meeting" pre-requisite, though the Chief was not ordered to either approve or deny Omni's application.

34.     Following the Supreme Court of Ohio's ruling on December 9, 2020, the Chief quickly issued Omni's permits to drill on or about December 16, 2020, and Omni proceeded to drill GMR#1 and GMR#2.

35.     Following construction of Omni's two (2) wells, and after all required testing was conducted; analyzed; and submitted for approval, the Chief then refused to issue Omni's permits to inject for several more months.

36.     Upon information and belief, the Chief's refusal to issue Omni's permits to inject was in direct retaliation for Omni's victory in the Supreme Court of Ohio relative the permits to drill.

37.     Based upon its clear right to its permits to inject, Omni filed a second original mandamus action in the Supreme Court of Ohio on October 18, 2021, in Case No. 2021-1287.

38.     However, on November 5, 2021, or eighteen (18) days later, the Chief belatedly issued Omni's permits to inject into both wells via Chief's Orders 2021-179 (GMR#1) and 2021-180 (GMR#2).  The Chief issued Omni's permits to inject without ever responding to Omni's second original mandamus action.  Immediately thereafter, Omni voluntarily dismissed Case No. 2021-1287 as moot.

**d.  Identification of USDWs:**

39.     Given the SDWA's focus on the protection of public water systems generally, and USDWs specifically, a Class II permitting process includes the identification of any USDWs in need of protection within an applicable "area of review."

40.     40 C.F.R. 146.3 defines the "area of review" as meaning, "[T]he area surrounding an injection well described according to the criteria set forth in § 146.06 or in the case of an area permit, the project area plus a circumscribing area the width of which is either ¼ of a mile or a number calculated according to the criteria set forth in § 146.06."

41.     At the time of Omni's permit application, however, the "area of review" was set in Ohio Administrative Code 1501: 9-3-05 at one-half (1/2) mile.   Thereafter, via amendment effective January 13, 2022, that section now requires an area of review of two (2) miles for a Class II injection well intended to inject more than 1,000 gallons per day per year.  However, as asserted below, the expansion of the area of review would have no material impact on this action whatsoever.

42.     Whenever a Class II permit to inject is issued, the Chief is required to set the "maximum allowable operating pressure," also known as "maximum allowable injection pressure" ("MAIP"), that prevents the migration of injected fluids into a USDW, which as noted above, the SDWA mandates.

43.     The SDWA does not establish a MAIP formula and/or mandate certain testing procedures when setting a permitted MAIP.

44.     Instead, a general MAIP limitation is imposed per 40 C.F.R. 146.23(a)(1). As noted above, the limitation states:  "[T]o assure that the pressure during injection does not initiate new fractures or propagate existing fractures in the *confining zone* adjacent to the USDWs. In no case shall injection pressure cause the movement of injection or formation fluids into an underground source of drinking water."  (Emphasis added.)

45.     40 C.F.R. 146.3 defines the "confining zone" as meaning, "[A] geological formation, group of formations, or part of a formation that is capable of limiting fluid movement above an injection zone."

46.     Also per 40 C.F.R. 146.3, an "injection zone," is defined as meaning, "[A] geological "formation", group of formations, or part of a formation receiving fluids through a well."

47.     Mechanically, a Class II injection well must have a MAIP greater than the existing "resting pressure" of the "injection zone" to pump brine from the surface into its permitted "injection zone," which is located several thousand feet below the surface.

48.     For a Class II well to be operable, both commercially and physically, the permitted MAIP must be greater than the "resting pressure" of the "injection zone."

49.     The term "resting pressure" is not explicitly defined in SDWA, or in its corresponding federal regulations within 40 C.F.R. Parts 144–148, which governs a state's UIC program.

50.     Within the injection well industry, "resting pressure" is generally defined as the natural, static pressure of the formation in the absence of any fluid injection or production activities. In other words, the "resting pressure" represents the equilibrium state of the fluid within the porous rock of the injection zone and is a critical parameter for designing and managing the injection well.

51.     Critical to this action, the SDWA and its accompanying regulations prohibits fluid (brine) movement from the "injection zone" such that it creates new fractures or propagates existing fractures within the "confining zone" adjacent to a USDW.

52.    A USDW is not merely an underground aquifer, regardless of volume or content.

53.    A USDW is specifically defined within the SDWA.  Again, within 40 C.F.R. 146.3, a USDW is defined as meaning,

> [A]n aquifer or its portion:
>
> (1)
>    (i)   Which supplies any public water system; or
>
>    (ii)  Which contains a sufficient quantity of ground water to supply a public water system; and
>
>      (A) Currently supplies drinking water for human consumption;
> or
>      (B) Contains fewer than 10,000 mg/l total dissolved solids; and
>
> (2) Which is not an exempted aquifer.

54.    During the Division's review process of Omni's permit applications, there were no USDWs identified within the "area of review," located above, below, or adjacent to GMR#1, GMR#2, the "injection zone", and/or the "confining zone" for either well.

55.    In short, there is no USDW in proximity to either GMR#1 or GMR#2, and therefore, no USDW is at risk from the operation of GMR#1 or GRM#2, regardless of their respective MAIPs.

56.    In fact, in 1991, ODNR's own Department of Water, Ground-Water Resources Section, published a non-litigation related ground-water map of Belmont County, Ohio ("ODNR Map"), which is attached hereto and incorporated herein as **Plaintiff's Exhibit C**.

57.    Per the ODNR Map, the vast majority of Belmont County, Ohio – including all of Omni's home township of Richland - has ground-water well yields assessed as, "AREAS IN WHICH YIELDS SELDOM EXCEED 3 GALLONS PER

MINUTE – Very limited, and often inadequate, supplies are obtained from thin beds of sandstone, shale and limestone. *Yields average less than two gallons per minute and the average depth of wells is 95 feet*." (Original and added emphasis.)

58.     In contrast, the ODNR Map identifies areas of Belmont County, located along the Ohio River approximately twelve (12) miles from Omni's injection wells, which are assessed as, "AREAS IN WHICH SEVERAL HUNDRED GALLONS PER MINUTE MAY BE DEVELOPED – Larger industrial and municipal supplies are available from thick, permeable sand and gravel deposits. This valley fill material ranges from 60 to 85 feet thick and is hydrologically connected to the Ohio River. Yields in excess of 1,000 gallons per minute may be developed from horizontal collector wells. *Wells in this area supply much of the county through regional water systems*." (Emphasis added.)

59.     Thus, without a migration of approximately twelve (12) miles, one that would need the associated pressure sufficient to fracture the "confining zone" some twelve (12) miles down range, Omni's Class II Saltwater Injection Well operation does not threaten any USDW with brine contamination in the short, medium, and/or long term, regardless of their respective MAIPs.

60.     Nonetheless, in Chief's Orders 2022-125 (GMR#1) and 2021-180 (GMR#2), the Chief ignored the clear language of the SDWA, as well as available scientific data, and intentionally set Omni's MAIP for both wells below the "resting pressure" of the formations into which Omni is permitted to inject.

### e.     The Chief's MAIP Determination:

61.     For all permits to inject issued prior to January 13, 2022, MAIP was set for each well pursuant to former Ohio Admin. Code 1501:9-03-07(D)(1) and (2).

62.     Former Ohio Admin. Code 1501:9-3-07(D) stated, "The maximum allowable operating pressure for any injection well shall be determined by one of the following methods," which given Ohio's primacy agreement, is intended to and must comply with the SDWA's operational requirements quoted above.

63.     Subsection (D)(1) provided a very conservative formula to determine MAIP, which the Chief initially used in this case when he issued MAIPs within Chief's Orders 2021-179 (GMR#1) and 2021-180 (GMR#2).

64.     Subsection (D)(2), however, provided for setting the MAIP by, "Such other formula *or test found to be accurate as applied to the facts presented in an application* and approved by the division."  (Emphasis added.)

65.     It is undisputed the MAIP formula within both versions of Ohio Admin. Code 1501:9-3-07 is designed to deliver a conservative operating pressure, and because of that reality, it is also undisputed that the EPA Guidance permits an operator to submit a step-rate test to prove a higher MAIP is permissible under the SDWA, especially (as here) where there is no USDW within the "area of review" to protect.

66.     On December 16, 2020, or one (1) week after Omni prevailed in the Supreme Court of Ohio on its first original mandamus action, the Chief issued permits to drill GMR#1 and GMR#2 with multiple terms and conditions attached.  Copies of Omni's permits to drill are attached hereto and incorporated as if fully re-written herein as **Exhibits D and E**, respectively.

67.     Condition No. 24 was identical in both permits to drill.

68.     Condition 24 required Omni to submit a "step-rate pressure test" to the Division for review prior to Omni requesting a permit to inject.

69.     The purpose of a step-rate test, where injection pressure is steadily increased according to plan, is to find the fracture pressure of a given formation. Once that is known, the MAIP is generally set (where there is a nearby USDW) by employing a safety factor of between 10% - 20%, meaning the maximum pressure prior to formation fracture is reduced by 10% - 20% to ensure fluid does not migrate into a USDW.

70.     Not all step-rate tests produce sufficient pressure to fracture a given formation, however.

71.     Since 1985, U.S. EPA guidance relative to the determination of a Class II MAIP has provided for a site-specific step-rate test as a preferred means to establish the MAIP for a Class II well. Yet, as noted below, Division had not required a step-rate test as part of a Class II permitting process since at least 2012. A copy of the U.S. EPA's Guidance memorandum is attached hereto and incorporated as if fully re-written herein as **Exhibit F**.

72.     Omni submitted its petroleum engineer's proposed step-rate testing procedures on April 5, 2021. The Division approved the procedures- without amendment -  on June 1, 2021. Omni's step-rate test procedure proposals are attached hereto and incorporated as if fully re-written herein as **Exhibits G & H.**

73.     Prior to the Division's step-rate testing requirement to Omni, it is uncontested the Division had not required a step-rate test as a requirement within a permit to drill since at least 2012.

74.     It is also uncontested that at all times relevant, the Division did not employ a licensed petroleum engineer on staff, and upon information and belief, no other Division employee had the experience, education, and/or the professional

qualifications to design, review, or analyze a step-rate test like the one the Division ordered Omni to perform.

75.     Omni conducted its step-rate test(s) in June 2021, pursuant to permit Condition No. 24.  The Division's on-site inspector, Ryan Armstrong, was duly notified and was on-site at the time of testing for each well.

>    **f.     OMNI's Step-Rate Results:**

76.     On or about July 12, 2021, Omni's submitted its step-rate analysis for GMR#1 and GMR#2 to the Division.  These are attached hereto and incorporated as if re-written herein as **Exhibits I & J**.

77.     During GMR#1's step-rate test, Omni's consulting petroleum engineer found a maximum pressure of 1,784 psi was reached without causing a new fracture in the injection zone relative to GMR#1, which is the shallower of Omni's two (2) wells. Omni requested a MAIP of 90%, or 1,605 psi, per its approved testing procedures.

78.     Similarly, GMR#2's step-rate test reached a maximum pressure of 3,562 psi, which fractured the injection zone.   With no adjacent USDW, Omni's consulting petroleum engineer still determined a 90% MAIP of 3,205 psi was safe and requested the Chief grant same.

79.     On November 5, 2021, with construction of GMR#1 and GMR#2 completed at a cost of approximately $7-$8 million – and following the filing of Omni's second original mandamus action filed on October 18, 2021, – the Chief issued Chief's Orders 2021-179 (GMR#1) and 2021-180 (GMR#2) (collectively "Original Orders") granting permits to inject brine into each well.  Copies of the Original Orders are attached hereto and incorporated as if fully re-written herein as **Exhibits K and L**.

80.     Included within the Original Orders, the Chief established a MAIP for each well, as required by former Ohio Admin. Code 1501:9-03-07(D).

81.     For GMR#1, the Original Orders established a MAIP of 1,120 psi. For GMR#2, MAIP was set at 1,315 psi. The Chief set these MAIPs via use of the conservative formula found in former Ohio Admin. Code 1501:9-03-07(D)(1).

82.     Based upon the step-rate test analysis, at a MAIP of 1,120 psi, GMR#1 is able to overcome the "injection zone's" "resting pressure" but just barely. At 1,120 psi, Omni is able to inject approximately three (3) barrels per minute ("bbm") into GMR#1, rendering it operable but only just viable commercially.

83.     Based upon its step-rate test analysis for GMR#2, at a MAIP of 1,315 psi, Omni is unable to inject Brine into GMR#2, as the MAIP is far less than the pressure necessary to overcome the "resting pressure" within the "injection zone."

84.     Upon information and belief, the Chief never considered Omni's request to increase its MAIP over-and-above the formula values, nor did the Chief consider the absence of any USDW prior to issuing his Original Orders, as he was otherwise required to do by law. Indeed, Division personnel acknowledged that they relied exclusively on the MAIP formula in former Ohio Admin. Code 1501:9-03-07(D)(1).

   **g.    Initial Operation of GMR#1:**

85.      Based on the MAIPs within the Original Orders, Omni was able to open GMR#1 (only) on or about December 1, 2021.

86.     As explained further below, Omni successfully and profitably operated GMR#1 without citation, violation, accident, and/or threat to public health from December 1, 2021, until approximately July 1, 2022.

87.     Omni was never able to open or operate GMR#2 given its permitted MAIP was too low to overcome the "injection zone's" "resting pressure."

88.     On November 17, 2021, Omni filed an initial appeal of the Original Orders with the Oil and Gas Commission of Ohio.  Omni argued the step-rate test results supported the higher MAIPs as compliant with both Ohio law and the SDWA.

**h.     Chief Revokes Chief's Order 2021-179:**

89.     On May 20, 2022, while the appeal of the Original Orders was pending, the Chief and Mr. Adgate caused two (2) new Chief's Orders, 2022-124 and 2022-125 ("New Orders"), to issue without prior notice to Omni relative to GMR#1.  Copies of said orders are attached hereto and incorporated as if fully re-written herein as **Exhibits M and N**.

90.     Chief's Order 2022-124 revoked Chief's Order 2021-179 (GMR#1's permit to inject) in its entirety.

91.     Chief's Order 2022-125 then immediately re-issued Omni's permit to inject relative to GMR#1 but at a new, even lower MAIP of 960 psi (down from the formula MAIP of 1,120 psi).

92.     At 960 psi, GMR#1's MAIP was now less than the "resting pressure" of the "injection zone."  As a result, Omni was forced to cease operation of GMR#1 given the physical impossibility of its intended use.

93.     The New Orders were issued based solely upon a May 17, 2022, memorandum issued to the Division's counsel by a litigation-retained petroleum engineer and co-defendant, Sean Murphy, P.E.  A copy of the Division's Expert Memorandum is attached hereto and incorporated as if fully re-written herein as **Exhibit O.**

94.     Mr. Murphy disagreed with the analysis of Omni's consultant and petroleum engineer, Joshua Ticknor, P.E., who provided his analysis of the step-rate testing nearly a year earlier on July 12, 2021. Omni's petroleum engineer's rebuttal to Mr. Murphy's report is attached and incorporated as **Exhibit P**.

95.     Mr. Murphy's analysis, among other problems, employed a standard guidance applicable to a Class I well, which is inapplicable to Omni's Class II wells, and Mr. Murphy failed to acknowledge and/or consider the complete absence of any USDW in his review.

96.     At the time Mr. Murphy issued his report, it is uncontested that the Division held no information whatsoever that Omni was injecting outside of its:

  a.  Permitted "injection zone," or

  b.  That Omni's formula MAIP was fracturing the "injection zone," or

  c.  That Omni's formula MAIP was propagating an existing fracture within its "injection zone," or

  d.  That the "confining zone" above GMR#1 was fractured or propagating factures within the "confining zone;" or

  e.  The original MAIPs were forcing the movement of injection fluids into any (nonexistent) USDW at the time the Chief issued Chief's Orders 2022-124 and 2022-125.

  **i.  Chief Refuses to *increase* GMR#2's MAIP despite Murphy's Report:**

97.     In yet another unlawful and bad-faith act, the Chief issued the New Orders lowering GMR#1's MAIP without a corresponding set of orders *increasing* GMR#2's MAIP. Given the Chief's reliance on Mr. Murphy's analysis to lower GMR#1's MAIP, logic dictated the Chief would and should likewise rely on Mr. Murphy's report where he

opined that GMR#2's MAIP could nearly double – from 1,315 psi to 2,558 psi - without danger.

98.     At all times relevant, and despite the absence of any identifiable USDW, the Chief has refused to raise GMR#2's MAIP to the level Mr. Murphy opined was safe.

99.     At 2,258 psi, GMR#2 would have sufficient pressure to overcome the "resting pressure" of the "injection zone," though again, just barely.

100.    Chief's Order 2022-125 also unilaterally declared it was issued subject to the new version of Ohio Admin. Code 1501:9-03, which took effect on January 13, 2022, or well after the Chief initially issued Chief's Order 2021-179 on November 5, 2021.

101.    Finally, as a result of New Orders, the need for a preliminary injunction hearing, the limited time availability of the Ohio Oil and Gas Commission Omni dismissed its appeal to the Ohio Oil and Gas Commission to pursue its administrative remedies to the Chief's unreasonable and unlawful New Orders in the Franklin County Common Pleas Court per R.C. 1509.36.  That litigation remains on-going but is entirely separate and apart from the federal issues presented herein.

## COUNT I – DECLARATORY JUDGMENT
## (28 U.S.C. §2201)

102.    Omni re-states and incorporates each and every allegation contained in paragraph 1-101, as well as all referenced exhibits and sub-parts, as if fully re-written herein.

103.    In addition to the facts included above, Omni further asserts that within the New Orders, the Chief formally issue factual finding No. 1 in each.  Factual finding No. 1 states: "The Chief finds that to minimize potential impacts to the surface, underground sources of drinking water, and other horizons, maximum allowable injection pressure must be set below fracture closure pressure in the injection zone."

104.   An actual controversy now exists between Omni, EPA, REGION V, ODNR, and the Chief relative to the construction and enforcement of the SDWA in Ohio.

105.   As a result, Omni seeks the following declaration of rights under the SDWA:

a. That neither the SDWA, nor any of its promulgated regulations, grants the EPA, or any primacy state, with the authority to take a regulatory action, including but not limited to the reduction of a Class II well operator's MAIP,  "to minimize potential impacts to the surface" or to minimize potential impacts to "other horizons;"

b. That the SDWA does not require and/or permit the EPA, or any primacy state, to set a Class II well's MAIP below the fracture closure pressure in the injection zone where there is no USDW within the "area of review" and/or there is no evidence that fluid migration threatens through a fracture, or propagation of a fracture, within the "confinement zone;"

c. That the SDWA does not grant the EPA, nor any primacy state, with the discretion to restrict a MAIP certified as safe by a duly licensed petroleum engineer, as found pursuant to a valid step-rate test, where there is no USDW located within the "area of review" relative to a Class II well;

d. That a fracture of the "injection zone," rather than the fracture of the "confinement zone," does not *per se* violate the SDWA where there is no USDW within the "area of review;"

e. That a fracture of the "injection zone" does not violate the SDWA even if a USDW is located within the "area of review," unless and until there is credible evidence of a new fracture, or the propagation of an existing

fracture, of the "confinement zone" which would then threaten fluid migration into the USDW;

f. The SDWA does not prohibit the migration of brine outside of the "injection zone," if that brine stays within the "confinement zone" and does not otherwise threaten fluid migration into a USDW, even if that fluid might seep into shallower oil and gas production well(s) because the SDWA does not otherwise protect oil and gas production wells;

g. That the SDWA does not limit a Class II well's MAIP where there is no USDW located within the "area of review" or other area of likely USDW impact; and

h. Relative to Omni, there is no USDW, as the SDWA defines same, within its "area of review" and/or within approximately twelve (12) miles of GMR#1 and GMR#2.

### COUNT II – MANDAMUS
### (28 U.S.C. §1361)

106. Omni re-states and incorporates each and every allegation contained in paragraphs 1-105, including all exhibits and sub-parts, as if fully re-written herein.

107. 28 U.S.C. §1361 grants original jurisdiction to the district courts in any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty owed to the plaintiff.

108. The EPA and REGION V hold a clear legal duty under the SDWA to Omni to ensure that all primacy states enforce the terms and conditions of the SDWA and its corresponding regulations in a fair, lawful, and consistent manner.

109. As part of its duty under the SDWA, EPA and REGION V are required to provide operational oversight of all primacy states, including Ohio, to ensure that all Class II permit holders receive equal treatment under the law.

110. In execution of its duty under the SDWA, the EPA and REGION V entered into various MOA's with the State of Ohio and ODNR, which further requires EPA and REGION V to provide sufficient oversight of ODNR and the Chief's UIC program to ensure SDWA compliance.

111. As a Class II well operator, subject to the SDWA's regulation, Omni is also a third-party beneficiary of the MOA between EPA, REGION V, and ODNR.

112. At present, the ODNR and the Chief, as well as the other named co-defendants, are operating the State of Ohio's UIC program in a grossly unlawful manner and in contravention of the SDWA and its applicable regulations.

113. Via the allegations set forth in this Complaint, neither EPA, nor REGION V, have fulfilled their duty to adequately oversee and ensure ODNR and/or the Chief are lawfully regulating Omni, as well as other Class II operators within the State of Ohio, under either the SDWA and/or the MOA.

114. As a result, Omni seeks an order of Mandamus directing the EPA and REGION V to do their lawful duty to conduct a competent review and proper oversite of the ODNR and the Chief's operation of the State of Ohio's UIC program as it relates to Class II well operators.

115. Such a Mandamus order is necessary to ensure the fair, lawful, and consistent application of the SDWA's regulations within the State of Ohio, including but not limited to ensuring ODNR and the Chief utilize only lawful considerations under the SDWA when setting a Class II well's MAIP.

## COUNT III – CIVIL ACTION FOR THE DEPRIVATION OF RIGHTS
### (42 U.S.C. §1983)

116.    Omni re-states and incorporates each and every allegation contained in paragraphs 1-115, including all exhibits and sub-parts, as if fully re-written herein.

117.    The State of Ohio has experienced an oil and gas production boom since approximately 2010, including but not limited to the development of the Utica Shale formation.

118.    A natural by-product of the increased fracking activity is the annual production of millions of barrels of brine, or saltwater.

119.    Ohio encourages the construction and operation of Class II wells to support the development of the oil and gas industry within the state, as well as to ensure the disposal of residual brine water does not threaten USDWs.

120.    In 2019, Omni acquired land in Richland Township, Belmont County, Ohio for the purpose of constructing two (2) new Class II wells at a cost of over $1,000,000.

121.    Omni thereafter complied with all aspects of Ohio Revised Code Chapter 1509, as well as Ohio Admin. Code 1501:9-03 to secure both its permits to drill and inject.

122.    Omni successfully, safely, and profitably operated GMR#1 from December 1, 2021, through July 1, 2022, when the ODNR, the Chief, Mr. Adgate, Mr. Brown, and Ms. Lovey unlawfully utilized a report from Mr. Murphy to unilaterally reduce Omni's MAIP for GMR#1 to a level that prevented the injection of brine into the "injection zone" with sufficient force to overcome the formation's "resting pressure."

123.    As a direct and proximate result of the defendants joint and several unlawful actions, Omni was forced to cease operation of GMR#1 at great financial loss.

124.    ODNR, the Chief, Mr. Adgate, Mr. Brown, and Ms. Lovey all unlawfully conspired to shutdown Omni's Class II well(s) even though they held no evidence of any permit violation, violation of Ohio law, violation of the SDWA, and/or any evidence of actual danger to the public's health and/or safety.

125.    Moreover, contemporaneous to their unlawful actions relative to GMR#1's operation, the ODNR, the Chief, Mr. Adgate, Mr. Brown, and Ms. Lovey all unlawfully conspired to use Ohio Revised Code Chapter 1509, Ohio Admin.Code 1501:9-03, as well as the SDWA to deny Omni the right to a MAIP sufficient to operate GMR#2.

126.    So pervasive was their unlawful scheme, the ODNR; the Chief; Mr. Adgate; Mr. Brown; and Ms. Lovey, all continued in their unlawful conspiracy to deny Omni the right to operate GMR#2 by refusing to increase GMR#2's MAIP even after Mr. Murphy produced a report on May 17, 2022, that informed them that GMR#2's MAIP could safely be raised from 1,315 psi to 2,558 psi, which would allow GMR#2 to operate.

127.    At all times relevant, the ODNR; the Chief; Mr. Adgate; Mr. Brown; Ms. Lovey; and Mr. Murphy, have exercised the power granted unto them via Ohio Revised Code Chapter 1509, Ohio Admin.Code 1501:9-03, as well as the SDWA, to unlawfully delay, and then prohibit, Omni from enjoying its rights under Ohio State law, as well as the SDWA, in the operation of both GMR#1 and GMR#2.

128.    At all times relevant, the ODNR; the Chief; Mr. Adgate; Mr. Brown; Ms. Lovey; and Mr. Murphy, have acted in egregious bad faith and openly unlawful conduct in the exercise of their duties under Ohio Revised Code Chapter 1509, Ohio Admin.Code 1501:9-03, and the SDWA.

129.    Defendants conduct, jointly and severally, have denied Omni its due process and equal protection of law under Ohio Revised Code Chapter 1509, Ohio

Admin.Code 1501:9-03, the SDWA, as well as Article I, Section 2 and Article I, Section 16 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution.

130.    At all times relevant, the Chief; Mr. Adgate; Mr. Brown; Ms. Lovey; and Mr. Murphy, were all personally involved in the unconstitutional conduct and/or violation of federal and state law.  Thus, all are liable to Omni in both their official and personal capacities.

131.    Additionally, the Chief; Mr. Adgate; Mr. Brown; Ms. Lovey; and Mr. Murphy, all jointly and severally, knew, or should have known, that their conduct expressly and overtly violated clearly established federal law, state law, and the Constitutions of both Ohio and the United States, which a reasonable person in their position would have, or should have, known.

132.    As a direct and proximate result of the defendants joint and several unlawful conduct, Omni was forced to cease operation from July 1, 2022, to the present. Said harm will continue until such time as Omni is granted MAIPs for both GMR#1 and GMR#2 sufficient to overcome the "resting pressure" with the "injection zone" of each well.

133.    As a direct and proximate result of its on-going harm, Omni has suffered and will continue to suffer specific economic harm in the form of lost profits, legal expenses from a multitude of needless legal actions, site preparation costs, as well as lost opportunity costs from its inability to accept of new business.

## PRAYER FOR RELIEF SOUGHT:

**WHEREFORE**, Plaintiff, Omni Energy Group, LLC, respectfully demands the following relief:

1) **Count I:**  A declaration of rights as to all questions posed in paragraph 105(a)-(h);

2) **Count II:**  A writ of Mandamus ordering EPA and REGION V to immediately perform its oversite, review, and analysis duty of ODNR's UIC program under the SDWA, to include a specific review of ODNR and the Chief's process and criteria relative to the establishment of Class II well MAIPs in Ohio, including but not limited to Omni's Chief's Order 2021-180 (GMR#2) and Chief's Orders 2022-124 and 2022-125 (GMR#1);

3) **Count III**:  The recovery of compensatory damages from the ODNR, Chief, Mr. Adgate, Mr. Brown, Ms. Lovey, and Mr. Murphy, jointly and severally, in both their official and individual capacities, to include the following special damages, which are the direct and proximate result of the defendants collective unlawful and bad faith conduct:

   a. **Lost business profits** in the amount of $3 million per year following Omni's forced closure from July 1, 2022, to June 30, 2023; $4 million from July 1, 2023, to June 30, 2024; and $2.5 million from July 1, 2024, to December 31, 2024;

   b. **Lost business opportunity** costs of $5 million per year from January 1, 2025, to the resolution of the District Court case (only), as Omni's forced closure has required Omni to forgo brine water disposal

contracts with multiple oil and gas production companies, including but not limited to Gulfport Energy Corporation;

c. **Punitive damages** for the defendants outrageous, purposeful, punitive, bad faith, and on-going unlawful conduct in the amount of $43.5 million, which is treble Omni's lost business profits and lost business opportunities combined;

d. **Reasonable Legal fees** for all other prior and/or on-going legal actions necessitated by the defendants unlawful and bad faith conduct in the amount of $1,000,000.00;

e. **Site Preparation Costs** which will be necessary to test and re-open Omni's two (2) Class II wells and storage facilities estimated at $250,000.00;

4) **The Costs of this Action**, including reasonable attorney fees, as provided for in 42 U.S.C. §1983;

5) **Injunctive Relief** to the extent the defendants, jointly and severally, must be ordered to no longer unlawfully deprive Omni of its rights under Ohio Revised Code Chapter 1509; Ohio Admin.Code 1501:9-03, the SDWA, or either the Ohio Constitution and/or the United States Constitution; and

6) **All Other Relief**, whether at law or equity, including pre- and post-judgment interest, to which Plaintiff is entitled or this Honorable Court deems appropriate.

Respectfully submitted,

GAGIN LEGAL SERVICES, LLC

By: _____
Christopher J. Gagin, Esq. (62820)
66560 Ault Drive
St. Clairsville, Ohio 43950
Phone: (740) 381-3869
Fax: (740) 888-0431
Email: *chris.gagin@gmail.com*

Counsel of Record for Plaintiff,
Omni Energy Group, LLC